**2014-1383**

**(Serial No. 77658158)**

# United States Court of Appeals
*for the*
# Federal Circuit

IN RE TRIVITA, INC.

*Appeal from the United States Patent and Trademark Office,
Trademark Trial and Appeal Board*

## BRIEF OF APPELLANT TRIVITA, INC.

Adam R. Stephenson
ADAM R. STEPHENSON, LTD.
40 W. Baseline Rd. Ste 101
Tempe, Arizona 85283
Telephone:  480.264.6075
Facsimile:   480.718.8336

*Attorney for TriVita, Inc.*

May 22, 2014

**Form 9**

FORM 9.   Certificate of Interest

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____ v. _____

No. _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

_____
_____
_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____
_____
_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____
_____
_____

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

_____
_____

_____          _____
            Date                              Signature of counsel

                                 _____
                                      Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST…………………………………………………i

TABLE OF CONTENTS…………………………………………………………..ii

TABLE OF AUTHORITIES……………………………………………………iv

STATEMENT OF RELATED CASES……………………………………………vi

JURISDICTION…………………………………………………………………1

STATEMENT OF THE ISSUES………………………………………………..1

STATEMENT OF THE CASE…………………………………………………1

      A.    Nature of the Case……………………………………………1

      B.    Proceedings at the USPTO………………………………………...2

STATEMENT OF FACTS………………………………………………………4

      A.    The Examination And Refusal To Register…………………………4

      B.    The Board's Decision Affirming The Refusal To Register…………..8

SUMMARY OF ARGUMENT……………………………………………...10

STANDARD OF REVIEW………………………………………………………12

ARGUMENT…………………………………………………………………...13

I.    The Board Erred In Holding That the Mark Is Merely Descriptive
    Of Goods Containing Nopal Juice…………………………………….......13

      A.    On Its Face, NOPALEA Is Not "Sufficiently Similar"
      To The Word "Nopal"…………………………………………...13

B.     The Board's Decision Relies on Hindsight Reasoning
       As The Low Level Of Botanical Sophistication Of Ordinary
       Consumers Requires Thought, Imagination, and Perception
       To Make An Association Between The Mark And The
       Goods…………...................................................................................15

C.     The Limitation Of The Channels of Trade In The
       Description of Goods Indicates Purchasers Are
       Informed At The Point Of Purchase Of The Nature
       Of the Goods And Not Dependent On Third-Party
       Information……………………………………………………..22

D.     The *Aloe Crème* Cases Are Fully Distinguishable
       On Their Facts And Establish No Rule That Should
       Be Adopted In This Case……………………………………………24

CONCLUSION…………………………………………………………………...30

# TABLE OF AUTHORITIES

CASES                                                          Page(s)

*Aloe Crème Lab. v. Aloe 99, Inc.*,
    485 F.2d 1241 (CCPA 1973)……………………………………26, 27, 28, 29

*Aloe Crème Lab. v. Aloe 99, Inc.*,
    188 USPQ 316 (TTAB 1975)…………………………………………...28, 29

*American Aloe Corp. v. Aloe Crème Lab. Inc.*,
    420 F.2d 1248 (7th Cir. 1970)………………………………9, 12, 24, 25, 26, 29

*Aloe Crème Lab. v. Milsan, Inc.*,
    423 F.2d 845 (5th Cir. 1970)…………………………………………..26, 27, 29

*In re Bayer Aktiengesellschaft*,
    488 F.3d 960 (Fed.Cir. 2007)…………………….........10, 11, 12, 13, 14, 15, 29

*Consol. Edison v. NLRB*,
    305 U.S. 197 (1938)…………………………………………………………...13

*DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*,
    695 F.3d 1247 (Fed. Cir. 2012)…………………………………11, 16, 17, 18

*In re Gyulay*,
    820 F.2d 1216 (Fed. Cir. 1987)………………………………………………..10

*Octocom Systems, Inc. v. Houston Computer Services, Inc.*,
    918 F.2d 937 (Fed. Cir. 1990)………………………………………..11, 22

*In re Nett Designs*,
    236 F.3d 1339 (Fed. Cir. 2001)……………………………………..11, 20, 21

*In re Pacer Tech.*,
    338 F.3d 1348 (Fed. Cir. 2003)……………………………………………..13

*In re Tower Tech, Inc.*,
    64 USPQ2d 1314 (TTAB 2002)…………………………………………17

*In re Viterra Inc.,*
    671 F.3d 1358 (Fed. Cir. 2012)……………………………………………12, 13

**STATUTES**

15 U.S.C. § 1052(a)…………………………………………………………...6

15 U.S.C. § 1052(d)……………………………………………………….passim

15 U.S.C. § 1052(e)(1)……………………………………………………passim

15 U.S.C. § 1071(a)………………………………………………………...1

28 U.S.C. § 1295(a)(4)(B)…..……………………………………………...1

**OTHER AUTHORITIES**

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
    § 11.21 (4th Ed. 2014)……………………………………….15, 16, 18, 19

Raul Puente-Martinez, *Taxonomic Revision and Phylogeny of the Genus* Nopalea
*Salm-Dyck (Cactaceae:  Opuntiodideae)* (2006)……………….......7, 13, 14, 19

## STATEMENT OF RELATED CASES

In accordance with Fed. Cir. R. 47.5, appellant TriVita, Inc. ("TriVita") states that:

(a)    No other appeal in or from this same proceeding before the U.S. Patent and Trademark Office, Trademark Trial and Appeal Board, was previously before this or any other appellate court.

(b)    Counsel is unaware of any other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTION

TriVita appeals the decision of the Trademark Trial and Appeal Board ("the Board"), entered December 17, 2013, affirming the refusal by the United States Patent and Trademark Office ("USPTO") to register the mark NOPALEA ("Mark") for goods in Class 5.  Application Serial No. 77/658,158.  (A018-024.) The Board refused registration on the ground that the Mark was merely descriptive under Section 2(e)(1) of the Lanham Act[1], 15 U.S.C. § 1052 (e)(1).

TriVita timely filed a Notice of Appeal under 15 U.S.C. § 1071(a) on February 12, 2014.  (A165-166.)  This Court has jurisdiction under 15 U.S.C. § 1071(a) and 28 U.S.C. § 1295(a)(4)(B).

## STATEMENT OF THE ISSUES

1.    Did the Board err in affirming the Examining Attorney's refusal to register TriVita's Mark NOPALEA on the ground the Mark was merely descriptive under Section 2(e)(1) of the Lanham Act, 15 U.S.C. § 1052(e)(1), when used in conjunction with goods "containing, in whole or in substantial part, nopal juice"?

## STATEMENT OF THE CASE

### A.    Nature of the Case.

This is an appeal of a non-precedential decision of the Board.  The Board held that Section 2(e)(1) of the Lanham Act barred registration of the Mark as

---

[1] "Lanham Act" refers to the Trademark (Lanham) Act of 1946, as amended and codified, 15 U.S.C. § 1051, *et seq.*

1

merely descriptive when used in conjunction with the described goods.  Section

2(e)(1) provides that a mark is not registrable on the Principal Register when it:

"(e) Consists of a mark which (1) when used on or in connection with the goods of

the applicant is merely descriptive or deceptively misdescriptive of them…"  15

U.S.C. § 1052(e)(1) (2014).

TriVita asserts that the Board erred in making this conclusion, as the Mark

is, at worst, suggestive of the applied-for goods.

## B.     Proceedings At The USPTO.

TriVita filed an application on January 28, 2009, to register the Mark on the

Principal Register based on its bona fide intent to use the Mark for goods in

International Class 005 for "dietary and nutritional supplements; nutritional

supplements."  (A018-A024.)  The Examining Attorney issued an Office Action

("First Action") on April 16, 2009 refusing registration. (A025-A033.)  On

October 9, 2009, TriVita filed a response ("First Response") amending the goods

description and arguing that the Examining Attorney's rejection was erroneous

(A034-A042.)  On October 29, 2009, the Examining Attorney issued a second

rejection ("Second Action") maintaining and adding to the previous rejections.

(A043-A050.)  On April 29, 2010, TriVita filed a second response ("Second

Response") which included a consent to use and registration.  (A051-A061.)

The Examining Attorney issued a third refusal ("Third Action") withdrawing

some rejections, maintaining others, and rejecting the consent agreement.  (A062-

A066.)  On December 1, 2010, TriVita filed a response ("Third Response")

indicating that TriVita had obtained ownership of the mark subject to the consent

by assignment and arguing that the Examiner's remaining rejections were error.

(A067-A076.)  On January 7, 2011, the Examining Attorney issued a fourth refusal

("Fourth Action") which withdrew some grounds of rejection, maintained others,

and added a new ground of rejection making requests for additional information.

(A077-A082.)  On April 9, 2011, TriVita filed an Amendment to Allege use.

(A101-A105.)  On that same day, TriVita filed a response ("Fourth Response")

that extensively addressed the Examining Attorney's requests for additional

information.  (A083-A100.)

     The Allegation of Use was accepted on May 6, 2011.  (A110.)  A fifth

refusal ("Fifth Action") issued on May 5, 2011, wherein the Examining Attorney

maintained the refusals and suggested an amendment to the goods description.

(A106-A109.)  After a telephonic interview with the Examiner that took place in

June of 2011, TriVita filed a response ("Fifth Response") on November 7, 2011,

amending the goods description and arguing the Examining Attorney's refusal was

erroneous  (A111-A115.)  On December 13, 2011, the Examining Attorney issued

a Final Office Action ("Sixth Action"), refusing registration on the basis that the

Mark was merely descriptive under Section 2(e)(1) of the Lanham Act.  (A116-

A123.)

TriVita timely filed a Notice of Appeal to the Board on June 4, 2012.

(A124). Oral argument was requested by TriVita which took place on November

13, 2013. (A164). On December 17, 2013, the Board affirmed the refusal to

register the Mark under Section 2(e)(1) of the Lanham Act. (A001-012.)

## STATEMENT OF FACTS

### A.    The Examination And Refusal to Register.

In the First Action, the Examining Attorney rejected the Application under

15 U.S.C. § 1052(d) ("Section 2(d)") as likely to cause confusion with U.S. Reg.

No. 3080538 for the mark NOPALEAN ("NOPALEAN mark") and under Section

2(e)(1) as descriptive (A025-A033), stating that the mark "merely describes a

feature of applicant's goods, namely, supplements derived from the plants of

Nopalea." (A030.) In the First Response, TriVita, through its prior counsel,

amended the goods description to "dietary and nutritional supplements sold

exclusively through multi-level direct marketing; nutritional supplements sold

exclusively through multi-level direct marketing." (A034-A042, emphasis added.)

In the First Response, prior counsel made factually incorrect statements regarding

the ingredients contained in TriVita's goods, including "Nopalea is the scientific

term for the cactus genus from which Nopal is derived but does not refer to the

extract itself." (A040).

In the Second Action, the Examining Attorney maintained the Section 2(d)

refusal over the NOPALEAN mark and added Section 2(d) rejections over Reg.

4

Nos. 3700698 and 3700684 for NOPALINA and NOPALINA and design, respectively, (the "NOPALINA marks"). (A043-A050.) The Examining Attorney also maintained the Section 2(e)(1) refusal on previous arguments and evidence and made a number of Requests for Information including questions regarding whether the goods were related to, derived from, or contain extracts from the "Nopalea plant" or have no connection to the "Nopalea plant." (A048-A049.) TriVita's prior counsel filed the Second Response, which, while intended to answer the Examining Attorney's requests, contained additional factually incorrect statements. (A051-A061.) These included "the term NOPALEA refers to the nopalea plant in the relevant industry" (A051); "the goods contain nopal which is an extract of the nopalea plant" (A051); "the [nopalea] plant itself is not used in the goods; only the nopal extracted from the plant" (A051); and "the goods contain nopal which is an extract of the nopalea plant" (A051). A consent to use and registration by Triarco, Inc., the owner of the NOPALEAN mark, was also filed indicating that the previously made amendment to the description of goods would prevent a likelihood of consumer confusion. (A052). Additional arguments that Applicant's Mark was unlikely to cause confusion with respect to the NOPALINA marks were also included including factually incorrect evidence stating that the NOPALINA marks translated from Spanish into nopaline, which was identified as a member of the opine family of compounds found in plant gall tumors. (A052-A054.)

In the Third Action, the Section 2(d) refusals over the NOPALINA marks were withdrawn and the Section 2(e)(1) descriptiveness refusal maintained based on previous argument and evidence. (A062-A066.) The Examining Attorney also took the highly unusual step of rejecting the submitted consent agreement as a "naked consent" and accordingly maintained the Section 2(d) refusal over the NOPALEAN mark. (A063-A064). TriVita's present counsel became attorney of record on the case on July 30, 2010. TriVita's current counsel filed the Third Response indicating that TriVita had obtained ownership of the NOPALEAN mark by assignment and presented various new arguments against descriptiveness. New evidence was presented regarding the existence of the term "nopal cactus," that the prickly pear cacti in the *Opuntia* genus are referred to as "nopal cacti," and that there are about 200 species of prickly pear cactus in this botanical genus, including *Opuntia ficus-indica*, which is the prickly pear cactus most commonly used as a food source. (A067-A076.)

In the Fourth Action, the Examining Attorney withdrew the Section 2(d) refusal, maintained the Section 2(e)(1) refusal on previous argument and evidence, and added a new rejection over 15 U.S.C. § 1052(a) ("Section 2(a)") on the ground that the Mark was deceptive. (A077-A082). The Examining Attorney made additional requests for information regarding the nature of the goods, including whether they included extracts from the "Nopalea plant." (A080-A081.) TriVita filed an Amendment to Allege use with a date of first use in interstate commerce of

February 28, 2009, with specimens that included a label with a list of ingredients indicating that the goods contained "Nopal fruit puree (*Opuntia ficus indica*)" and "Nopal powder (*Opuntia ficus indica*)" (A101-A105, A211-A218).

On that same day, TriVita filed the Fourth Response that extensively addressed the Examining Attorney's requests for additional information.  (A083-A100.)  The Fourth Response included a Declaration of Gene Henderson (A194-A197) and relevant portions of *Taxonomic Revision and Phylogeny of the Genus* Nopalea *Salm-Dyck (Cactaceae:  Opuntiodideae)* a master's thesis authored by Raul Puente-Martinez at Arizona State University in 2006, selections of which are submitted in A228-249.  As the Biographical Sketch portion (A249) of the submitted thesis indicates, Mr. Puente-Martinez was born and raised in Mexico and has been involved in arid plant research for many years, beginning on the Opuntia cactus family in Mexico and on the Nopalea cactus genus while residing in the United States pursuing a master's degree and working as a curator and botanist at the Desert Botanical Garden in Phoenix, Arizona.  TriVita argued that the submitted evidence showed that the term "nopal cactus" is used in the industry to refer to prickly pear cacti from both the *Opuntia* and *Nopalea* genera and that the term "nopalea plant" is not used in the industry.  The Declaration of Gene Henderson and TriVita's statements expressly and specifically repudiated and corrected the erroneous statements made by TriVita's former counsel in the First and Second Responses.

7

The Allegation of Use was accepted on May 6, 2011. (A110.) The Examining Attorney then issued a Fifth Action, maintaining the Section 2(a) refusal, suggesting an amendment to the goods description, and maintaining the Section 2(e)(1) refusal solely on the basis of previously made argument and evidence. (A106-A109.) The Examining Attorney also suggested the application be amended to the Supplemental Register. (A107.) After counsel conducted a telephonic interview with the Examiner in June of 2011, TriVita filed the Fifth Response amending the goods description to "dietary and nutritional supplements sold exclusively through multi-level direct marketing; nutritional supplements sold exclusively through multi-level direct marketing; all of the foregoing containing, in whole or in substantial part, nopal juice." (A111-A115, emphasis added.)

The Examining Attorney then issued as a Final Action, the Sixth Action, in which the Section 2(a) rejection was withdrawn in view of the amendment made to the goods description and making out a new Section 2(e)(1) refusal. The Examining Attorney made, for the first time, after four intervening Office Actions, a new Section 2(e)(1) refusal of registration on the basis of descriptiveness (A116-A123), citing various internet sources as additional evidence and citing as supporting evidence those statements made by TriVita's previous counsel in the First and Second Responses which had been expressly repudiated and corrected by evidence provided in the Fourth Response by TriVita. (A119-A121.)

**B.    The Board's Decision Affirming The Refusal To Register.**

8

The Board's decision affirmed the refusal to register under Section 2(e)(1) of the Lanham Act.  (A001-012.)  The Board based its decision on various items of evidence pulled from the voluminous record in this case, copies of which are reproduced in A167-A193.  After reproducing summaries of portions of the relied-upon evidence (A004-010), the Board focused its analysis on the goods description which states that the goods contain "nopal juice." (A011.)  After remarking that this description of goods itself does not indicate whether the nopal juice is derived from cacti from either the *Opuntia* or *Nopalea* genera, the Board stated that "[c]onsumers may well assume, (as apparently do some of applicant's affiliates) that, as a characteristic of nopal juice, applicant's goods derive from genus nopalea [sic]." (A011.)

The Board cited as authority in support of this conclusion *Amer. Aloe Corp. v. Aloe Crème Lab., Inc.*, 420 F.2d 1248 (7th Cir. 1970), averring that the case stands for the proposition that "where the alleged mark holder sought to register variants of a plant genus "aloe," the terms were found to be generic not only for pharmaceuticals but for cosmetics as well…" (A012.)  The Board then quoted the following from *American Aloe* (at 1252): "Defendant cannot appropriate for its own trademark use the generic name of the distinguishing and effective ingredient in its product." (A012.)

The Board concluded its analysis with "we are left with no doubt that a consumer would understand the term "nopalea" used in connection with

9

applicant's goods as conveying information about them.  Therefore we find that the applied-for mark is merely descriptive of the identified goods."  (A012, internal citations omitted.)

## SUMMARY OF ARGUMENT

The Board erred in summarily concluding the Mark is descriptive based on the finding that "a consumer would understand the term 'nopalea' used in connection with applicant's goods [containing nopal juice] as conveying information about them" (A012).  In its decision, the Board failed to conduct the proper descriptiveness analysis, and its conclusion shows the inevitable result of "skipping steps":  1) the Board failed to establish sufficient factual underpinnings to support its conclusion and, 2) the Board failed to identify that the most relevant case law is fully distinguishable from the facts of the present case.

Review of this Court's decisions regarding determining descriptiveness indicates the analysis begins with a comparison of the mark at issue with the common name(s) of the goods.  *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 964 (Fed.Cir. 2007).  By implication from *Bayer*, if the mark and common name are not "substantially similar" such that the purchasing public does not immediately associate the mark with the common name based on appearance and sound, then an inquiry must be made as to whether imagination, thought, and perception are required for the consumer to perceive the relationship between the mark and the goods.  *In re Gyulay*, 820 F.2d 1216, 1217 (Fed. Cir. 1987).  Such analysis

10

naturally must consider such factors as the meaning of the mark in the minds of the purchasing public (*Bayer,* 488 F.3d at 964-965) and any effects on the purchasing public resulting from the channels of trade in which the goods are sold, but only where the channels of trade are specifically denoted in the description of goods. *Octocom Systems, Inc. v. Houston Computer Services, Inc.*, 918 F.2d 937, 941 (Fed. Cir. 1990). The Board is required to cite evidence establishing the perception of the mark in the mind of the ordinary consumer of the goods in question as well as document the mental steps involved in the consumer making a connection between the mark and the listed goods. *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1253-54 (Fed. Cir. 2012). If, at the conclusion of the analysis, it is found that imagination, thought, and perception are still required for the ordinary consumer to make the association between the mark and the goods as sold in the specific channels of trade, the mark is suggestive, and no proof of secondary meaning is required for registration on the Principal Register. *In re Nett Designs*, 236 F.3d 1339, 1341 (Fed. Cir. 2001).

In its decision, the Board conducted no evaluation as to whether the Mark NOPALEA and the word "nopal" were similar in sight and sound. The Board's analysis of the evidence of record also failed to establish the level of sophistication of the ordinary purchaser of the goods and how that evidence would prove that ordinary purchasers of low botanical sophistication (the majority of purchasers) would immediately make the association between the word "nopalea" as a genus

11

name for prickly pear cacti and goods containing "in whole or in substantial part, nopal juice". The Board also failed to address any effects that the express limitation on the channels of trade in the application would have on consumers, as the limitation that the goods are sold exclusively through multi-level direct marketing shows consumers would not be depending just on third-party information to learn about the goods. All of these errors by the Board resulted in a failure to establish substantial evidence to support the Board's conclusion that the Mark is descriptive.

Finally, because the Board failed to note the differences in sight and sound between the Mark and the word "nopal," the Board erroneously relied on the decision of the Seventh Circuit in *American Aloe* (420 F.2d at 1252) as authority to support its conclusion that because the Mark was the same as the prickly pear cactus genus name *Nopalea,* the mark is merely descriptive when used in conjunction with goods containing nopal juice. This case, and its related cases, are fully distinguishable and establish no rule of law that should be adopted by the Court in this case.

## STANDARD OF REVIEW

The Board's factual determinations are reviewed for substantial evidence. *In re Viterra Inc.* 671 F.3d 1358, 1361 (Fed. Cir. 2012). A determination that a trademark is merely descriptive is a factual determination. *Bayer*, 488 F.3d at 964. The issues raised in this appeal therefore concern the Board's factual conclusions

12

and are reviewed by this Court to determine whether the Board's decision is

supported by substantial evidence.  The Court summarized what is substantial

evidence in *Viterra* (at 1361):

> Substantial evidence is "'more than a mere scintilla' and [is] 'such
> relevant evidence as a reasonable mind would accept as adequate' to
> support a conclusion." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed.
> Cir. 2003) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197 (1938)).
> Accordingly, "[w]here two different conclusions may be warranted
> based on the evidence of record, the Board's decision to favor one
> conclusion over the other is the type of decision that must be sustained
> by this court as supported by substantial evidence."  *Bayer,* 488 F.3d
> at 970 (alterations in original) (parallel citations omitted).

## ARGUMENT

### I.    The Board Erred In Holding That the Mark Is Merely Descriptive Of Goods Containing Nopal Juice.

#### A.    On Its Face, NOPALEA Is Not "Sufficiently Similar" To The Word "Nopal."

In *Bayer* (488 F.3d at 964-965), this Court endorsed the Board's approach to

first conduct a comparison between the visual appearance and sound of the Mark

with the common word for the goods in question to determine if the Mark is

"sufficiently similar" to the common word.  In this case, the word comparison is

between the term "nopal," from "nopal cactus" and the Mark NOPALEA.  As is

manifest in various parts of the record[2], including the Master's Thesis authored by

---

[2]See also the Declaration of Gene Henderson ("Henderson Declaration") at A195-A196.

Raul Puente-Martinez[3] (the "Thesis"), the term "nopal cactus" or "nopal" is the

common name "used in Mexico for all flat-stemmed pricklypears in [genera]

*Nopalea* and *Opuntia*." (A245.) "Nopal" is also the term used in TriVita's

description of goods, and appears in the English dictionary evidence of record

(A173-175). Since "nopal" is the common term, the term from which the genus

name *Nopalea* was derived, and the term used in TriVita's goods description, a

comparison between these two words is the logical first step in analyzing whether

the mark NOPALEA is descriptive.

With respect to appearance, the words differ by the addition of the letters

"EA" at the end of NOPALEA. In *Bayer*, the Court agreed with the Board that

merely adding a single "A" at the end of the word "aspirin" to form ASPIRINA,

was insufficient to create a change in visual appearance. *Id.* at 965. However, in

this case, more than one letter, indeed, two different letters, are added, making it

very evident to the consumer that the words "nopal" and NOPALEA are visually

distinct from each other.

The visual difference is emphasized because the two letters make the

NOPALEA Mark a four syllable word in contrast with the two syllables of the

word "nopal." Whether the consumer chooses to pronounce the Mark "No pah

lay' uh" as recommended on TriVita's packaging (A218) or as "No pall ee' uh,"

two additional syllables have been added to the sound of the word as a

---

[3] Selections from the Thesis portions submitted in the record are at A228-A249.

consequence of the two added letters. These additional syllables make the NOPALEA mark fundamentally different in sound than the word "nopal" ("No pall.") The difference in sound between the Mark and the word "nopal" is also in contrast with *Bayer*, where the Court noted that, while ASPIRINA had one to potentially two more syllables than "aspirin," considering the mark as a whole, the difference in sound was not significant. *Id.* at 965.

Because the Mark NOPALEA and the word "nopal" differ significantly in appearance and sound, consumers will not immediately associate the Mark with goods containing nopal juice on the basis of the visual and audible impression of the marks. These facts, not included in the Board's decision, indicate that the Mark is at worst suggestive of the goods in question.

**B.    The Board's Decision Relies on Hindsight Reasoning Because The Low Level Of Botanical Sophistication Of Ordinary Consumers Requires Thought, Imagination, and Perception To Make An Association Between The Mark And The Goods.**

Whether the Mark "immediately conveys" information about nopal cactus juice depends on the meaning the Mark has in the minds of the actual consumers who encounter it in the specific channels of trade listed in TriVita's description of goods. *Bayer,* 488 F.3d at 963. Professor J. Thomas McCarthy comments that:

> the better view is that of the "reasonably informed shopper." The hypothetical potential customer should be assumed to have amount of basic knowledge about the product that most people would have from news and advertising. But such a person is not an expert and is not completely informed as to all the qualities and attributes of

the product.  1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 11.21 (4th Ed. 2014).

The Board made no factual findings as to the level of botanical sophistication of the average consumers likely to encounter TriVita's goods.  The Board assumed that the average consumer's understanding was adequately represented by what the dictionary definitions and other evidence cited taught.  However, the evidence is just information, and standing alone without further analysis, does not by itself identify the level of understanding of the average purchaser of TriVita's goods.

The importance of making factual findings on the record as to the level of understanding of the average purchaser is important as Professor McCarthy continues:

> If the evidence shows that the product or service is sold only to persons who are experts or highly knowledgeable in a given field, then, like the "reasonably prudent person" of tort law, the standard should be adjusted accordingly.  Such a person will probably already know a great deal about the product or service.  *McCarthy*, at §11-21.

This comment becomes more significant in view of the analysis this Court conducted in *DuoProSS*.  There the Court was called upon to analyze whether the design trademark SNAP! with a broken exclamation point was descriptive when used for safety syringes with breakable plungers.  The Court reversed the Board's conclusion that the mark was not descriptive observing:

16

The Board, however, failed to cite any evidence indicating how a consumer would perceive a mark incorporating the exclamation point. In the absence of any such evidence in the record, the Board effectively imposed its own view about the commercial impression of the mark rather than that of the relevant consumer.  *Id.* 695 F.3d at 1254.

In that case, the safety syringes were intended for use by medical personnel who were specifically instructed to how to snap off the syringe plunger to keep the needle withdrawn within the syringe to prevent accidental needle sticks to healthcare workers.  *Id.* at 1249 and 1254.  The evidence showed that the persons using the device were trained healthcare workers and instructions were provided showing how to use the devices.  *Id.* at 1254 and 1256.  This evidence indicated that the users of the goods were highly knowledgeable about them and their use, and the Court took this knowledge into account, citing the test used in assessing the effect of such knowledge by the consumer on a determination of the descriptiveness of a mark:

> "The question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them." *In re Tower Tech, Inc.*, 64 U.S.P.Q.2d 1314, 1316–17 (TTAB 2002). The Board's own findings indicate that the SNAP! design mark, viewed in the context of Inviro's products, does nothing other than depict the snapping of a syringe plunger: the prominent functional feature of Inviro's goods.  *DuoProSS*, 695 F.3d at 1254.

As the Court concluded, since the potential purchasers of the goods were healthcare workers knowledgeable about the operation of the snap-off plungers of

17

the syringes, the SNAP! design with a broken exclamation mark was merely descriptive. *Id.* at 1254. They understood immediately what the mark was referring to. The Court reversed because the Board failed to make the necessary findings as to how such a knowledgeable consumer would perceive the mark. *Id.* at 1253-54. This failure to find evidence supporting the level of knowledge of the ordinary purchaser, and the failure to properly document the mental steps the Board thought took place during the consumer's exercise of "imagination, thought, and perception to determine that the mark was referring to the snapping of a syringe plunger," (*Id.* at 1253) caused the reversal of the Board's decision.

The Board has made identical errors in this case. The Board has not made findings of fact on the record as to the sophistication of the average consumer of the goods in question. Nor has the Board has not made any findings of fact evidence regarding the mental steps required for the average consumer encountering the mark in the context of the goods to make the association between the two. Instead, the Board relies on hindsight reasoning to support its conclusion of descriptiveness. Professor McCarthy comments that "[w]ith the benefit of hindsight, many really suggestive terms would be labeled as 'descriptive,' but that is not the way ordinary shoppers view marks. Hindsight should be avoided in this enquiry." *McCarthy on Trademarks*, at § 11.21. The lack of evidence on these points and the use of hindsight reasoning by the Board is error.

TriVita's products are marketed to the public at large through multi-level direct marketing.  The evidence, particularly the web evidence from online botanical sources cited in the Board's decision at A004, A007-A009, and the Thesis (A228-A249), indicates that people who read the dictionary for obscure words, arid plant botanists, and people very familiar with prickly pear cacti (i.e., who market, sell, or provide expert information on the internet regarding the same, i.e., the Rivenrock Gardens pages, A189-A193) may understand the botanical meaning of the word "nopalea."  These are a very small botanically knowledgeable group of people but are not the average "reasonably informed shoppers," referenced by Professor McCarthy, who are purchasing TriVita's goods.

When conducting an analysis of the sophistication of the average consumer the knowledge of TriVita affiliate members, reflected in the web pages in the record that come from TriVita's affiliate members (A176-A180, A188), is not relevant to the inquiry, as they are not ordinary purchasers.  Affiliates, by definition, have encountered the Mark based on their association with TriVita itself and have access to information the average consumer will not.  TriVita has the ability to directly communicate information to its affiliates and educate them on the facts relating to, as well as the proper use of, the Mark.  Furthermore, the Affiliates, as Mr. Henderson stated, make their own statements and "do not necessarily reflect the position of or information provided by the Applicant." (A197.)  Also, the various third-party (non-TriVita affiliated) web pages included

19

in the record (A181-A187) that discuss TriVita's products are also not highly relevant to establishing the level of sophistication of the ordinary purchaser either. What these third parties have written does not accurately reflect what the ordinary purchaser knows. These articles are written by people who have educated themselves about the products and taken the time to write the content, not the vast majority of purchasers, who will have passively accumulated information about the products primarily through advertising or word of mouth communication before encountering the Mark in association with the goods.

As few people engage in regularly reading the dictionary to learn new words, are arid plant botanists, or grow cacti in the United States for profit or food, TriVita believes it is reasonable to conclude that the average potential purchaser's level of sophistication regarding cactus botanical taxonomy is low. Accordingly, when such an average consumer encounters the goods, the first step in the analysis starts with the consumer's impression of the mark itself, and whether the mark creates an immediate association with the listed goods. *Nett Designs,* 236 F.3d at 1341. This step requires the Board to consider whether average consumer will immediately recognize the botanical meaning of the word "nopalea." "Nopalea" is not a word in English or Spanish, but a coined Latinized version of the Spanish word "nopal," which was derived from the Nahuatl Indian word "nōpalli." (A198.) None of the evidence of record (dictionary or otherwise) establishes that "nopalea" is a word for "nopal" or a word for "nopal juice" itself. Because of this, the

average consumer of low botanical sophistication is very unlikely to have immediate recall of or be in possession of the meaning of the word "nopalea." Accordingly, he or she will have to look up what "nopalea" means in a dictionary or other online reference.

If the consumer has to look up the meaning of the word "nopalea" at the conclusion of the first step, this fact in itself establishes that the consumer is engaging in exercise of imagination, thought, and perception, and that the Mark is not descriptive. The Board's own process of reasoning in the decision supports this conclusion. After spending seven pages reviewing evidence designed to educate the reader on what the words "nopalea" and "nopal" mean, the Board concludes that "[c]onsumers may well assume, (as apparently do some of applicant's affiliates) that, as a characteristic of nopal juice, applicant's goods derive from genus nopalea [sic]." (A011.) Unfortunately for the Board, the determination whether a mark is descriptive is not made in hindsight. In other words, the conclusion is not made after the average consumer of low sophistication studies the botanical taxonomy relevant to the Mark and then re-examines the Mark with the benefits of such an education; rather, the analysis is measured on the present sense, immediate impression made by the Mark on the average consumer at the time the Mark is encountered in conjunction with the listed goods. *Nett Designs,* 236 F.3d at 1341. Erroneously, the Board's decision rests entirely on the former hindsight analysis.

21

In view of the foregoing, the Board has failed to find facts sufficient to support its conclusion of descriptiveness, and incorrectly conducted its analysis of the evidence of record. With the proper facts in place regarding the sophistication of the consumer and considering those facts without the use of hindsight reasoning, the evidence clearly supports both a finding that the Mark NOPALEA is merely suggestive of goods containing nopal juice and a reversal of the Board's decision.

**C.    The Limitation Of The Channels of Trade In The Description of Goods Indicates Purchasers Are Informed At The Point Of Purchase Of The Nature Of the Goods And Not Dependent On Third-Party Information.**

The goods description at issue includes the limitation as to the channels of trade in which the goods move in that they are "sold exclusively through multi-level direct marketing." This is a stated limitation, not one that TriVita is attempting to establish on the description through evidence of its actual commercial use, in contrast with that in *Octocom Systems* where the applicant attempted to establish the existence of specific trade channels but the description of services was not so limited. 918 F.2d at 941. The effect of the limitation on the channels in trade means that the average consumer can only purchase the listed goods through a multi-level direct marketing sales process. In practice, this means that consumers can purchase the products directly from TriVita or from TriVita affiliated members. There is no third-party source of the goods to the purchaser—

22

no brick and mortar stores and no resellers.  Accordingly, as the average consumer comes to TriVita or TriVita affiliated members to purchase, the information the consumers encounter at the point of sale comes directly from TriVita or TriVita affiliates.  TriVita can actually ensure the Mark is used non-descriptively in conjunction with the goods in question at the point of sale, which fosters the identification in the consumer's mind between the Mark and TriVita as the source of the goods.

This situation differs significantly from the case where the goods are sold via any and all channels of trade.  In such cases, consumers may have only information coming entirely from third-party sources as they encounter the Mark at the point of sale.  The trademark holder has much less control over how its Mark is used in conjunction with third-party developed content at the point of sale.  Since the listed goods are distributed directly through a multi-level marketing process, they could not be purchased from Rivenrock Gardens on its site (A189-A193) or from any of the third party sites included in the evidence of record (A181-A187).

As an example of TriVita's care in properly using the NOPALEA trademark in relation to the goods, it is significant that none of the evidence cited by the Board shows TriVita itself using the NOPALEA trademark in a descriptive way. TriVita wishes to correct the impression made that the quoted evidence in the Board's decision from the top paragraph on A007 came from an official TriVita site, www.sonoranbloom.com.  Referring to A187, an actual copy of the source of

23

the quotation, it is clear that URL for the quoted text actually came from

nopalea1.weebly.com, a third-party site and not TriVita itself.

Because the limitation on the channels of trade ensures that TriVita is

involved directly in all purchases of the goods, the average consumer will not be

exposed to descriptive use of the trademark or misinformation regarding the source

of the goods at the point of purchase.  Accordingly, the channels of trade limitation

assists TriVita with ensuring that consumers associate the NOPALEA trademark

with TriVita and not as a descriptive name of the goods being sold.

### D.    The *Aloe Crème* Cases Are Fully Distinguishable On Their Facts And Establish No Rule That Should Be Adopted In This Case.

In its decision, the Board cited *American Aloe*, averring that the case stands

for the proposition that "where the alleged mark holder sought to register variants

of a plant genus "aloe," the terms were found to be generic not only for

pharmaceuticals but for cosmetics as well…"  (A012.)  The Board then quoted the

following (at 1252): "Defendant cannot appropriate for its own trademark use the

generic name of the distinguishing and effective ingredient in its product."

(A012).

As TriVita has found no other cases closer to the particular factual situation

presented herein other than the family of cases surrounding *American Aloe,* a fuller

discussion regarding these cases is given below.  This discussion establishes the

Board's error in relying upon *American Aloe* as a source of authority to support a position that the Mark is descriptive.

As is discussed in the various published opinions, the genesis of these cases was the rise of Aloe Crème Laboratories, Inc. ("Aloe Crème") in the late 1950s which sold products containing a stabilized form of a gel derived from the *Aloe vera* plant. *Id.* at 1250.   The company began selling its products under various trademarks and obtained various registrations on the Principal and Supplemental registers for such marks as ALO-PLUS, TRAV-ALO, ALO-MOISTURE PLUS, ALO-V SKIN CLEANSER, ALO-BEAUTY MATTE, ALO-TONE, ALO-ROUGE, ALO-LIPSTICK, ALO-POUDRE, ALO-V SHAMPOO, ALO-COSMETICS, ALO-CABANA SET, ALO-LEGS.  *Id.* at 1250.  Aloe Crème was challenged by a number of competitors in the 1960s and 70s who all sought to market products with names that included the word ALOE, which is identical to the genus name of the plant that was the source of the gel in both Aloe Crème's and the competing products.  Published court opinions involving a number of legal actions taken by Aloe Crème against these various competitors may be found, but the facts regarding three will be considered here because, in these cases, a decision was rendered by a Circuit Court of Appeals or this Court's predecessor, the Court of Customs and Patent Appeals ("CCPA")[4].

---

[4] These cases are *American Aloe Corp. v. Aloe Crème Lab. Inc*., 420 F.2d 1248 (7th Cir. 1970), *cert. denied,*  398 U.S. 929 (1970) ("*American Aloe*"); *Aloe Crème Lab.*

In the *American Aloe* case decided by the Seventh Circuit, Aloe Crème sued American Aloe Corporation for marketing products with trade names containing the word ALOE. *American Aloe,* 420 F.2d at 1250. The Seventh Circuit held that Aloe Crème "has no trademark rights, through use or registration, in the term 'ALO-' by itself." *Id.* at 1251. The Seventh Circuit found the ALO- mark generic and denied Aloe Crème the ability to establish secondary meaning. The reasoning was that the Seventh Circuit regarded the term ALO- as being the generic common name for products containing extracts of *Aloe vera* plants. (*Id.* at 1251.)

In contrast, the Fifth Circuit in the *Milsan* case criticized the issued Seventh Circuit opinion in *American Aloe* on the ground that its analysis was the result of improperly including a group of cases in a "denominative category." These cases were:

> a group of cases involving marks that were descriptive because they referred to an ingredient of the product involved. The policy of the former instance [avoiding creating a monopoly in a commodity through granting a generic trademark on the same] appears less persuasive in this situation. The "ingredient" cases reach different results, and must be reconciled on the basis of factual distinctions….Moreover, denomination appears to be a new damnation for aspiring trademarks. By placing "Alo" in this category, the [Seventh Circuit] denied secondary meaning without the necessity of discussing any evidence relevant to the claim. We do not believe the present case can be resolved by the application of an appropriate epithet—be it generic description or denomination. *Milsan,* 423 F.2d at 849.

---

*v. Milsan, Inc.*, 423 F.2d 845 (5th Cir. 1970), *cert. denied*, 398 U.S. 928 (1970) ("*Milsan*"); and *Aloe Crème Lab. v. Aloe 99, Inc.,* 485 F.2d 1241 (CCPA 1973) ("*Aloe 99*").

The Fifth Circuit agreed with the Seventh Circuit's analysis "insofar as it holds that the evidentiary burden, necessary to establish secondary meaning, is substantial where the mark applied to an article designates a principal ingredient desired by the public." *Id.* at 850. The Fifth Circuit did not agree that the ALO- mark was fundamentally generic, but held that Aloe Crème had failed to produce sufficient evidence to prove secondary meaning existed.

In 1973, the CCPA was presented with a similar issue during review of the opposition proceeding Aloe Crème filed against Aloe 99, Inc.'s application for the trademark ALOE 99 in stylized form. *Aloe 99,* 485 F.2d at 1241. In its decision, the court stated:

> It appears to have been the board's view that since the descriptiveness of 'ALOE' and 'ALO" had been judicially decided and because the question of likelihood of confusion is a question of law, the case could appropriately be disposed of on a motion for summary judgment. *Id.* at 1242.

However, the CCPA did not see it that way, remarking that "[d]escriptiveness of 'ALOE' and 'ALO' is not the only issue in this case." *Id.* at 1242. The CCPA then remanded the case to the Board so that additional evidence could be taken on the issue of likelihood of confusion in the opposition proceeding. *Id.* at 1242. By so doing the CCPA, the predecessor to this Court, deferred ruling on the issue decided by the Fifth and Seventh Circuits regarding the descriptive or generic character of the ALOE or ALO- trademarks. On remand, the Board took

27

additional evidence and ultimately determined that sufficient evidence had been shown for Aloe Crème to establish secondary meaning in the combination of ALO-with another word which was sufficient to sustain an opposition. *Aloe Crème Lab. v. Aloe 99, Inc.* 188 USPQ 316, 326 (TTAB 1975) (unpublished in the Federal Reporter.) (*Aloe 99 II.* )

In its opinion in *Aloe 99 II*, the Board commented on the holdings of the Fifth and Seventh Circuits and stated that:

> It should be noted at the outset that the findings of these courts as to lack of "secondary meaning" in the term "ALO" are not controlling on the Board in resolving the issue herein because the Court of Customs and Patent Appeals, in its directive on the remand, specifically indicated that opposer should be afforded an opportunity to produce evidence of "secondary meaning" of its several marks as well as to the question of a "family of marks" and other matters relevant to the disposition of this case. Implicit in this directive is the obligation by the Board to review any evidence submitted in this regard and to arrive at an independent conclusion based thereon. *Id.* at 326.

TriVita has uncovered no subsequent history for this case, indicating that the matter was not taken up again by the CCPA. Because the Board's decision is not binding on this Court, and the CCPA made no ruling on the issue of the descriptive or generic character of the ALOE or ALO- marks, those decisions created no controlling prior legal precedent in this Circuit in relation to this issue. Because of this, the Board, in issuing its present decision in the present case, was not bound to follow the holdings of either the Fifth or Seventh Circuits.

Furthermore, the facts of the Aloe Crème cases differ significantly from the facts of the present case in several key aspects. The first aspect is that the question of whether the NOPALEA mark is generic was not at issue before the Board and is likewise not before the Court in this appeal. The second aspect is that the mark at issue in the Aloe Crème cases was ALO- and was used in conjunction with goods that contained extracts of plants taxonomically classified in the botanical *Aloe* genus. With respect to sight and sound, the only difference between the mark and the genus name is the dropping of the "E." Because of this, the mark and the genus name were regarded by the courts in the cases as being essentially identical. *American Aloe,* 420 F.2d at 1253; *Milsan.* 423 F.2d. at 849; *Aloe 99,* 485 F.2d at 1241. Under the analysis set forth in *Bayer*, these marks would be regarded as being "sufficiently similar." 488 F.3d at 964-965.

In the present case, the Mark NOPALEA and the word "nopal" are visually and aurally distinguishable by the consumer and not "sufficiently similar" under *Bayer*. *Id.* at 964-965. Nor does the evidence of record establish that NOPALEA is a substitute word for "nopal" in the industry. (Henderson Declaration, A196.) Because of these significant factual differences between this case and the *Aloe Crème* cases, it is error for the Board to apply the rule of the Seventh Circuit to the present situation. Had the Board performed the test recommended in *Bayer*, it would have become immediately apparent that the *Aloe Crème* cases were

29

distinguishable because of the lack of similarity between NOPALEA and the common word "nopal."

## CONCLUSION

For the foregoing reasons, TriVita respectfully requests that the Court reverse the Board's decision and direct that NOPALEA application be approved for publication.

May 22, 2014                              Respectfully submitted,

                                         /s/ Adam Stephenson
                                         _____
                                         Adam R. Stephenson
                                         ADAM R. STEPHENSON, LTD.
                                         40 W. Baseline Rd., Ste 101
                                         Tempe, AZ 85283
                                         Telephone:  480.264.6075
                                         Facsimile:  480.718.8336
                                         Email:  adam@patentproblempro.com

                                         *Attorney for Appellant TriVita, Inc.*

**ADDENDUM**

> THIS OPINION IS NOT A
> PRECEDENT OF THE TTAB

Mailed:                                Hearing:
December 17, 2013                       November 13, 2013

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Trivita, Inc.
_____

Serial No. 77658158

_____

Adam R. Stephenson of Adam R. Stephenson Ltd., for Trivita, Inc.

Samuel Paquin, Trademark Examining Attorney, Law Office 111 (Ronald Sussman, Managing Attorney).[1]

_____

Before Quinn, Wellington and Ritchie, Administrative Trademark Judges.

Opinion by Ritchie, Administrative Trademark Judge:

Trivita, Inc., applicant herein ("applicant"), seeks

registration on the Principal Register of the mark

---

[1] Examining Attorney Erin Falk handled the prosecution of this application on behalf of the Office; however, subsequent to briefing of this appeal, Mr. Paquin was substituted as the assigned examining attorney and he represented the Office at oral argument.

Ser. No. 77658158

"NOPALEA,"[2] in standard character format, for goods
identified as "Dietary and nutritional supplements sold
exclusively through multi-level direct marketing;
nutritional supplements sold exclusively through multi-
level direct marketing; all of the foregoing containing, in
whole or in substantial part, nopal juice," in
International Class 5.  The trademark examining attorney
finally refused registration on the ground that applicant's
proposed mark is merely descriptive of the identified goods
under Trademark Act Section 2(e)(1), 15 U.S.C.
§ 1052(e)(1).

Both applicant and the examining attorney filed
briefs, and applicant filed a reply brief.  At applicant's
request, a hearing was held and presided over by this panel
on November 13, 2013.

## Descriptiveness

A term is deemed to be merely descriptive of goods or
services, within the meaning of Section 2(e)(1), if it
forthwith conveys an immediate idea of an ingredient,
quality, characteristic, feature, function, purpose or use
of the goods or services.  *See, In re Chamber of Commerce*

---

[2] Serial No. 77658158, filed on January 28, 2009, amended to
filing under Trademark Act Section 1(a) of the Trademark Act, 15
U.S.C. § 1052(a), with dates of first use and first use in
commerce asserted from February 28, 2009, as filed with Statement
of Use on April 9, 2011.

*of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed.
Cir. 2012), *citing In re Gyulay,* 820 F.2d 1216, 3 USPQ2d
1009 (Fed. Cir. 1987); *see also In re Abcor Development
Corp.*, 588 F.2d 811, 200 USPQ 215, 217-18 (CCPA 1978).
Whether a term is merely descriptive is determined not in
the abstract, but in relation to the goods or services for
which registration is sought, the context in which it is
being used on or in connection with those goods
or services, and the possible significance that the term
would have to the average purchaser of the goods or
services because of the manner of its use.  That a term may
have other meanings in different contexts is not
controlling.  *In re Bright-Crest, Ltd.*, 204 USPQ 591, 593
(TTAB 1979).

The examining attorney argues that the term "nopalea"
is merely descriptive of the goods in the application, in
that the goods contain nopal, "which is derived from an
abstract of the nopalea plant." (EA's brief at unnumb'd 5
of 14).  Applicant admits that nopal juice *may* derive from
the nopalea cactus, but argues that 1.) because nopal juice
may derive from either the nopalea *or* the opuntia cactus,
it cannot be considered merely descriptive, but rather, at

worst suggestive;[3] and 2.) applicant's specific product, as
shown on the label on its specimen, in fact derives from
the opuntia rather than the nopalea cactus.  We take these
arguments in turn and discuss the evidence of record.

> The term "nopalea" refers to a genus of cacti:

> Nopalea: noun, a genus of the cactus family with
> scarlet flowers.  April 16, 2009 Office Action,
> p.40.
> *Dictionary.com*.

> Nopalea cochenillifera: Family Cactaceae; Genus
> Nopalea.
> Identification: Genus Nopalea; Species:
> cochenillifera; Variety: Cultivar; Common Names
> nopal; Family Cactaceae.  April 16, 2009 Office
> Action, p. 37.
> *www.crescentbloom.com*.

> Genus Nopalea: (noun) a genus of the cactus
> family with scarlet flowers.    December 13, 2011
> Office Action, at 29.  *http://www.Elook.org*.

> Dictionary definitions of "nopal" refer to both the

genus "nopalea" and to the genus "opuntia"[4]:

> Nopal: 1. Any of various cacti of the genera
> *Nopalea* or *Opuntia*, including the prickly pear
> and similar species. 2. The fleshy, oval, edible
> pad of such a cactus.  April 9, 2011 Response to
> Office Action, p.2.   *http.//education.yahoo.com*.

---

[3] Applicant stated in its brief and confirmed at oral hearing:
"Therefore, based on the usage in the industry, the term 'nopal
juice' in the description of the goods could refer to extracts
taken from both the genera *Nopalea* and *Opuntea*." (appl's brief at
8).  We take this as an admission that the extract could derive
from either cactus.  These statements are also, as noted,
confirmed by the record.
[4] As noted, there is some disagreement in the record as to the
relationship of the nopalea, opuntia, and prickly pear cacti.
See also discussion in Henderson decl., *infra.*

Ser. No. 77658158

> Nopal: 1. Any of a genus (Nopalea) of cacti of
> Mexico and Central America that differ from the
> prickly pears in having erect petals and scarlet
> flowers with the stamens much longer than the
> petals; *broadly* prickly pears.; 2. A fleshy
> young tender stem segment of the prickly pear
> cactus (especially *opuntia ficus-indica)* or the
> nopal cactus used as food.  April 9, 2011
> Response to Office Action, p.3.  *www.merriam-*
> *webster.com (2011).*

Nopalea is used in food and recipes, and

sometimes medicinally.  We note that some of these

sites appear to be from affiliates of applicant,

touting the benefits of nopalea:

> Nopalea: *A genus of the cactus family with*
> *scarlet flowers.*  Plants of Nopalea are
> pollinated by hummingbirds, and their winter
> flowering coincides with hummingbird migration.
> The stems and flowers are edible and used as
> forage.  The plants are used medicinally as a tea
> to relieve kidney-stone pain and as a poultice on
> wounds and Diabetes.
> Nopal is often used to relieve the symptoms of
> overindulgence in alcohol, including dry mouth
> and nausea.  It is also thought to lower fats and
> cholesterol in the blood and is becoming
> increasingly popular as a means to decrease blood
> sugar levels and control diabetes.  April 16,
> 2009 Office Action, at 31-32.
> *www.nopalea.org.*

> Natural Benefits from Nopalea Health Products:
> To begin, it is important to highlight where the
> ingredients to these miracle juices are formed.
> The fruits used for these health drinks come from
> the cactus plants that grow in arid areas of the
> Southwestern United States.  Once harvested,
> these fruits are turned into juices which are

Ser. No. 77658158

then bottled and sent directly to customers. . .
.

The effects that these Nopalea products give off
are varied and unmistakable after someone ingests
these products.  January 7, 2011 Office Action,
at 2-3.
*www.healthhubarticles.com.*

Nopalea Cactus Fruit Health Gives Benefits and
Protection from Obesity and Other Diseases:
The power of Nopal cactus is Remarkable with
Nopalea Sonoran Bloom by Trivita Wellness.
Trivita is a World Class Direct Selling Company
offering exclusively this Unique Miracle Formula
of Nopalea by Trivita.  Trivita's Nopalea Cactus
Fruit has been featured on Tv.  Read More Here or
See The Product. [sic]

Nopalea (No-pah lay uh) blends antioxidant-rich
Nopal cactus superfruit with naturally sweet
Agave nectar to bring you a deliciously unique
concentrated wellness drink. . . .

The Nopal or Nopalea Cactus Fruit Contains
Betalains.
January 7, 2011 Office Action, at 5.  Press
Release.  *www.1888pressrelease.com.*


Nopalea: Nopalea juice can help relieve pain and
inflammation in your body! Do you or anyone you
know suffer from arthritis, heart disease,
diabetes or any of the many autoimmune disorders
like lupus or fibromyalgia?  Medical research
shows these health conditions and many more are
associated with inflamed tissues in the body.
The nopalea cactus is one of the most nutrient
rich cactus species known to science.  This
desert plant has proven anti-inflammatory
properties.  Clinical studies show that the
opuntia cactus is effective in fighting chronic
inflammation.  Nopal cactus juice is made from
this plant's magenta colored fruit. . . .
Nopalea fruit is low in calories, as well as
sodium. . . .
What is Nopalea Cactus Juice?

Nopalea cactus juice is now available as a tasty
nutrition drink! . . .
Nopalea cactus supplements can also help improve
immune system function in your body.  January 7,
2011 Office Action, at 16-17.
*http://www.sonoranbloom.com/content/products/nopa
lea/researchandscience*.


Commercially, the ingredients from the nopalea
cactus fruit are used in the food industry as red
food dyes to improve the color of tomato paste,
sauces, desserts, jams and jellies, ice cream,
sweets and breakfast cereals.
Health Benefits: Due to its harsh arid
environment, the nopalea cactus fruit of the
Sonoran Desert has the highest concentration of
betalains of any plant on earth!  This includes
other nopalea cactus from other regions of the
world.  These health promoting substances are now
available in a specially formulated cactus juice
drink called *Nopalea*. December 13, 2011 Office
Action, at 18.
*http://www.best-natural-health-supplements.com*.


Rivenrock Gardens sells as it's [sic] premier
variety the cactus called Nopalea Grande.  This
is a nearly spineless cactus that is easy to
prepare, and has a delightful taste both raw and
cooked.  One should harvest the nopal cactus when
the individual leaf is young and fresh.
*www.rivenrock.com/recipes*. [images follow]
December 13, 2011 Office Action, p8-11:

**Ser. No.** 77658158

Ingredients:
two pounds of cactus prepared and diced
a couple cans of diced tomatoes
three or four pickled jalapeno peppers (or to taste)
three cloves or more (to taste) of garlic
one-half medium onion
a can each of red kidney, black bean, and pinto beans
pinch of basil
a bunch of cilantro
quarter cup of olive oil
couple dashes of salt and some ground black pepper will add flavor
A handful of sunflower seeds, shelled pumpkin seeds, or pine nuts, or
any mix of them

For a real crowd pleaser at a picnic or party make this cactus salsa ahead of time and allow to blend its flavors in the refrigerator for a few hours or more. Just mix all the ingredients above that you can obtain. Some hot peppers are always in favor here in the SouthWest, but other folks may need it tamed down on the hot peppers some. One can use this as a dip for tortilla chips, or a relish and garnish on burritos (see breakfast burritos to the right, meat dishes or a general spicy condiment.

### Victoria's cactus breakfast burrito

This is one of my favorite recipes, the cactus mixes very well with these ingredients and tastes very good.

Take the prepared and diced cactus and add to some potatoes that are already pretty well cooked with your favorite spices including garlic and onions. After a minute or so add a couple of fresh eggs to the mix and scramble all together well. Heat some tortilla shells and spoon the mixture into the shells, add salsa roll up and enjoy.

### Victoria's French fried Cactus

In this recipe the freshly cut and cleaned cactus pads are cut into french fry style strips 3/8" wide and rolled in a batter of milk and eggs then rolled through flour, cornmeal or a combination of both. Frying in a skillet or deep fryer will give a deep gold/green color. They are really great fresh out of the oil.

### Fava Bean and Nopales soup

1/2 lb Fava beans, washed well and drained
1/2 cup Olive Oil
1/2 Onion cut into large pieces
1 and 1/2 quarts of water
2 cloves of garlic
4 to 5 cactus pads
1/2 diced onion

Combine the Favas, oil, onion and two cloves garlic. Cook in a covered pot bringing to a slow boil and continue to cook until the Favas are soft and the liquid is thick. Do not salt. This takes about 2 and 1/2 hours. Stir frequently. Meanwhile clean the cactus pads and cut them into 1/4 inch cubes. Boil them with salt garlic and onion for about 15 minutes. Before serving add the cactus to the soup and stir well. Makes approximately 6 servings. Baby Lima or Haba beans can be substituted for the Fava beans.

### Cactus and Bean Salad

**Ser. No.** 77658158



Applicant submitted into evidence a thesis on prickly pear cacti to show the difference between nopalea and opuntia cacti.  However, information contained therein appears to state that while the blooming times are different, "One new combination has been made, transferring *Nopalea hondurensis* from *Opuntia."*  Puente-Martinez, Taxonomic Revision and Phylogeny of the Genus *Nopalea,* Salm-Dyck (Cactaceae Opuntioideae) (Thesis 2006 at Abstract iii).  The thesis further discusses how both genuses refer to, or are referred to as "nopal":

Etymology: The genus name is derived of the
Spanish word 'nopal', used in Mexico for all

A009

flat-stemmed pricklypears in *Nopalea* and *Opuntia.*
[sic]
*Id.* at 51.

Applicant admits to being "familiar with the word 'nopal' as it refers generically to a number of different prickly pear cactus species." (Henderson decl., at para. 5). However, Mr. Henderson attested that he is "unaware that any extract or compound of a nopal plant, nopal cactus, or prickly pear cactus is referred to or known by the word 'nopal' in the industry." *Id.* He further stated that "In the industry, the prickly pear cactus is referred to as a 'nopal plant' or 'nopal cactus' but not as a 'nopalea plant.'" *Id.* at para. 6. He further added, "I declare that the applied for goods do contain extracts of the nopal plant or nopal cactus." *Id.* at para. 5.

Finally, applicant argues that while "nopal" may refer to both or either genus, applicant's product "[p]resently contains juice from the fruit of the *Opuntia ficus-indica* prickly pear cactus, also known as the Indian fig prickly pear." (Henderson decl. at para. 6). However, we note that applicant's identification of goods is not so limited. We are bound to make a determination not by applicant's current use or labeling, but rather by applicant's identification of goods in its application. *Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d

937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("[t]he
authority is legion that the question of registrability of
an applicant's mark must be decided on the basis of the
identification of goods set forth in the application
regardless of what the record may reveal as to the
particular nature of an applicant's goods, the particular
channels of trade or the class of purchasers to which the
sales of goods are directed." [Citations omitted]).  There
is no indication in applicant's identification of goods
that the "nopal juice" in its goods derives from opuntia
rather than nopalea cacti.  The record indicates that
nopalea is indeed a genus of cacti which is used for food
and medicine, and which is commonly referred to as "nopal."[5]
Consumers may well assume, (as apparently do some of
applicant's affiliates) that, as a characteristic of nopal
juice, applicant's goods derive from genus nopalea.  In
this regard, applicant helpfully pointed us to the case
*Amer. Aloe Corp. v. Aloe Crème Laboratories, Inc.,*[6] 420 F.2d
1248, 164 USPQ 266 (7th Cir. 1970) (ALOE as generic or
descriptive because identical to plant genus name).  As the

--------

[5] Although Mr. Henderson's declaration attests that it is not so
known in the industry, the record indicates that dictionary and
web evidence associates "nopal" with "nopalea."
[6] The case was subsequently cited by the Board in *Aloe Crème
Laboratories, Inc. v. Aloe 99, Inc.,* 188 USPQ 316 (TTAB
1975).

court there noted, where the alleged mark holder sought to register variants of a plant genus "aloe," the terms were found to be generic not only for pharmaceuticals but for cosmetics as well, stating:

> Defendant cannot appropriate for its own trademark use the generic name of the distinguishing and effective ingredient in its product.
> (at 268).

Accordingly, we are left with no doubt that a consumer would understand the term "nopalea" used in connection with applicant's goods as conveying information about them. *See In re Tower Tech Inc.*, 64 USPQ2d at 1316-17; *see also In re Conductive Services, Inc.*, 220 USPQ 84, 86 (TTAB 1983). Therefore we find that the applied-for mark is merely descriptive of the identified goods.

**Decision:** The refusal to register under Trademark Act Section 2(e)(1) is affirmed.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of May, 2014, as required by Federal Rule of Appellate Procedure 25(c)(2) and the Court's May 17, 2012 Administrative Order Regarding Electronic Case Filing, the foregoing Brief of Appellant was served on all counsel of record via the Court's electronic filing system.  Appellant will file by hand with the Court six (6) paper copies upon the Court's acceptance of its e-filed brief.

/s/ Adam Stephenson
_____

Adam R. Stephenson
ADAM R. STEPHENSON, LTD.
40 W. Baseline Rd., Ste 101
Tempe, AZ 85283
Telephone:  480.264.6075
Facsimile:  480.718.8336
Email:  adam@patentproblempro.com

*Attorney for Appellant TriVita, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief is 30 pages long and contains 7404 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32(b).

2.    This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word® 2010 in 14-point Times New Roman font.

May 22, 2014                              /s/ Adam Stephenson
                                          _____
                                          *Attorney for TriVita, Inc.*